# EXHIBIT B

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

HARVEST MOON DISTRIBUTORS, LLC,

        Plaintiff,

v.                                             Case No: 6:20-cv-1026-Orl-40DCI

SOUTHERN-OWNERS INSURANCE COMPANY,

        Defendant.
_____/

## ORDER

This cause is before the Court on Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 3 (the "**Motion**")) and Plaintiff's Response to Defendant's Motion to Dismiss and Incorporated Memorandum of Law (Doc. 19 (the "**Response**")). Upon consideration, Defendant's Motion is due to be granted.

**I.    BACKGROUND**

This lawsuit arises from a dispute between Plaintiff Harvest Moon Distributors, LLC, and Defendant Southern-Owners Insurance Company as to Plaintiff's entitlement to payments under its commercial insurance policy (hereinafter, the "**Policy**"). Plaintiff, a wine and beer distributor, purchased beer at an unspecified date in accordance with its contract with Walt Disney Parks and Resorts US Inc. ("**Disney**"). (Doc. 1-2, ¶¶ 34, 39). On March 15, 2020, before Plaintiff shipped its product, Disney voluntarily closed to the public due to the COVID-19 pandemic. (Doc. 1-2, ¶ 33; Doc. 3, p. 6). Disney subsequently refused to accept Plaintiff's product or compensate Plaintiff. (*See* Doc. 3, p. 6).

Four days after Disney's voluntary closure, Plaintiff submitted a claim to Defendant for loss of business income, extra expense, inventory, and accounts receivable caused by the pandemic. (*Id.*). On April 15, 2020, Plaintiff submitted a sworn proof of loss of its product to Defendant, claiming that its beer spoiled while Disney remained closed. (*Id.* at pp. 6–7). Defendant denied Plaintiff's claim. (*Id.* at p. 7).

On May 22, 2020, Plaintiff filed a complaint in Florida state court, requesting damages for breach of contract and declaratory judgment that it is entitled to coverage under the Policy. (Doc. 1-2, ¶¶ 28, 31; Doc. 3, pp. 2, 7). On June 11, 2020, Defendant removed the case to this Court. (Doc. 1). Defendant filed the instant Motion on June 18, 2020 (Doc. 3), and Plaintiff filed its Response on July 17, 2020 (Doc. 19). On July 31, 2020, Defendant submitted a reply to Plaintiff's Response (Doc. 29 (the "**Reply**")).

## II. STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(1). Thus, to survive a motion to dismiss made pursuant to Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To assess the sufficiency of factual content and the plausibility of a claim, courts draw on their "judicial experience and common sense" in considering: (1) the exhibits attached to the complaint; (2) matters that are subject to judicial notice; and (3) documents that are undisputed and central to a plaintiff's claim. *See id.*; *Parham v.*

*Seattle Serv. Bureau, Inc.*, 224 F. Supp. 3d 1268, 1271 (M.D. Fla. 2016).

Though a complaint need not contain detailed factual allegations, mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555. Moreover, courts are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994) (per curiam).

In sum, courts must (1) ignore conclusory allegations, bald legal assertions, and formulaic recitations of the elements of a claim; (2) accept well-pled factual allegations as true; and (3) view well-pled allegations in the light most favorable to the plaintiff. *Iqbal*, 556 U.S. at 679.

## III. DISCUSSION

Federal courts construe insurance contracts according to substantive state law. *See Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. of Pittsburgh, Pa.*, 412 F.3d 1224, 1227 (11th Cir. 2005) (citation omitted). In Florida, "the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage." *State Farm Mut. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006) (citation omitted); *see LaTorre v. Conn. Mut. Life. Ins. Co.*, 38 F.3d 538, 540 (11th Cir. 1984). Because the instant Policy was issued in Florida, Florida law controls its interpretation. (Doc. 3, p. 4).

"Under Florida law, the interpretation of an insurance contract is a matter of law to be decided by the court." *AIX Specialty Ins. Co. v. Ashland 2 Partners, LLC*, 383 F. Supp. 3d 1334, 1337 (M.D. Fla. 2019). Moreover, "Florida courts have said again and again that 'insurance contracts must be construed in accordance with the plain language of the policy.'" *Sphinx*, 412 F.3d at 1227 (citing *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003)). When interpreting insurance contracts for purposes of a Motion to Dismiss, "coverage clauses . . . are interpreted in the broadest possible manner to effect the greatest amount of coverage," and "exclusionary clauses are strictly construed, again in a manner that affords the insured the broadest possible coverage." *Fabricant v. Kemper Indep. Ins. Co.*, 474 F. Supp. 2d 1328, 1331 (S.D. Fla. 2007) (citing *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. 5th DCA 1997)). When an insurance policy "unambiguously reveals that the underlying claim is not covered," dismissal is appropriate. *Cammarota v. Penn-Am. Ins. Co.*, No. 17-cv-21605, 2017 U.S. Dist. LEXIS 188073, at *5–6 (S.D. Fla. Nov. 9, 2017) (collecting cases).

"To state a claim for breach of contract, a plaintiff must allege: '(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach.'" *Mauricio Martinez, DMD, P.A. v. Allied Ins. Co. of Am.*, No. 2:20-cv-00401, 2020 WL 5240218, at *2 (M.D. Fla. Sept. 2, 2020)[1] (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)). Plaintiff clearly alleges the existence of the Policy (Doc. 1-2, ¶ 18) and damages resulting from Defendant's alleged breach (*Id.* ¶ 25). Thus, the only remaining issue is whether Plaintiff properly alleged a material breach.

---

[1] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

4

To allege a material breach, Plaintiff must establish that the denied claim was covered by the Policy. Upon review of the Policy's plain language, coverage exists when (1) the insured suffers a "direct physical loss of or damage to Covered Property," (2) arising from a covered Cause of Loss, (3) provided that the loss is not otherwise excluded under the Policy. (*See* Doc. 3-1).[2] The Court analyzes the sufficiency of Plaintiff's Complaint by addressing each element in turn.

### A. Whether the Complaint Alleges Direct Physical Loss or Damage

To state a claim for breach of contract under the Policy, Plaintiff must first allege a "direct physical loss of or damage to Covered Property." (Doc. 3, p. 3). Plaintiff alleges that it suffered a "direct physical loss of or damage to" its beer.

If Plaintiff properly alleges the general requirement of "direct physical loss of or damage to Covered Property" (*i.e.*, the beer), then it may also be entitled to payments under the Business Income and Extra Expenses Endorsement and the Accounts Receivable Endorsement. (*See id.* at p. 8). To sufficiently plead claims for business income, extra expenses, and accounts receivable coverage, Plaintiff must comply with the terms of the respective Endorsements.

#### 1. Loss of Beer

First, Plaintiff claims that it suffered a "direct physical loss" of its beer. In relevant part, the Policy provides:

---

[2] "[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

5

### A. COVERAGE

> We will pay for *direct physical loss of or damage to* Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

(Doc. 3-1, p. 33) (emphasis added). Notably, the Policy does not define "direct physical loss or damage." (*See* Doc. 3-1). "Covered Property" includes "Stock," which is defined as "merchandise held in storage for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping." (*Id.* at pp. 33, 42).

Plaintiff alleges that it "operates as a wine and beer distributor, supplying its products to certain Vendors," and that it "purchased South African beers" pursuant to its contract with Disney. (Doc. 1-2, ¶¶ 34, 39). Plaintiff therefore properly alleges that its beer constitutes "Stock." (Doc. 3-1, pp. 33, 42).

The Complaint also asserts that the beer spoiled when Disney voluntarily closed due to the pandemic, and that the spoliation of Plaintiff's product constituted a direct physical loss. (Doc. 1-2, ¶¶ 13, 15, 42) ("Plaintiff's loss of use of the insured property and insured property's inability to function as contemplated and intended by Plaintiff . . . is a direct physical loss."). The Complaint therefore alleges enough factual matter to plead a plausible claim that the spoiled beer constitutes a covered loss because the current alleged condition of the beer makes it inedible. *See Iqbal*, 556 U.S. at 678.

Defendant argues that no "direct physical loss or damage" occurred because there was no actual damage to Plaintiff's beer. (Doc. 3, pp. 13, 18). Plaintiff counters that "direct physical loss" does not require actual damage to or destruction of the property. (Doc. 19, p. 7). Thus, the parties raise the question of whether spoliation of the beer constitutes "direct physical loss or damage." However, for the purpose of determining the propriety

6

of the instant Motion, the Court does not need to address this question now. Plaintiff alleges spoliation of the beer, which sufficiently raises a plausible claim that "direct physical loss or damage" occurred.

### 2. Loss of Income

Second, Plaintiff claims that it suffered a loss of income when its beer spoiled. The Policy includes two endorsements that pertain to monetary loss: (1) the Business Income and Extra Expense Endorsement; and (2) the Accounts Receivable Endorsement.

Under the Business Income and Extra Expense Endorsement, coverage for loss of business income is provided as follows:

> **a. Business Income**
>
> Subject to the Limit of Insurance provisions of this endorsement, we will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration."
>
> Business income means the:
>
> **(1)** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
> **(2)** Continuing normal operating expenses incurred, including payroll.

(Doc. 3-1, p. 19). Additionally, the Endorsement covers "necessary Extra Expense[s] . . . incur[red] during the 'period of restoration.'" (*Id.*). An "Extra Expense" is an expense incurred:

> **(1)** To avoid or minimize the suspension of business and to continue "operations":
> **(a)** At the described premises or at a "newly acquired location"; or
> **(b)** At a replacement premises or at temporary locations, including:

7

                    **1)**  Relocation expenses; and
                    **2)**  Costs to equip and operate the replacement or temporary locations.
      **(2)**    To minimize the suspension of business if you cannot continue "operations"; or
      **(3)**    **(a)**  To repair or replace any property; or
                **(b)**  To research, replace or restore the lost information on damaged valuable papers and records . . .

(*Id.*). The Endorsement defines "operations" as "business activities occurring at the described premises or at a 'newly acquired location'" and "period of restoration" as beginning on the date of the direct physical loss or damage and ending on the date when the property "should be repaired, rebuilt or replaced with reasonable speed and similar quality." (*Id.* at p. 22).

      Plaintiff alleges a loss of business income and extra expenses incurred "to minimize the suspension of business and continue its operations" when its product spoiled due to Disney's voluntary closure (Doc. 1-2, ¶¶ 13–15, 33, 40). Plaintiff argues that these allegations are sufficient because its "inability to sell its product was a suspension of its business operations" and "[t]he period of restoration would be the timeframe in which the Plaintiff would be able to replenish its stock and resume sales operations." (Doc. 19, pp. 13–14).

      But Plaintiff merely states that *Disney* suspended operations. (*Id.* ¶ 33). Plaintiff never explicitly alleges that it suspended its "operations" or underwent any "period of restoration." (*See* Doc 1-2). Specifically, there is no indication that Plaintiff was unable to purchase beer from its suppliers, sell beer to willing buyers, or deliver beer to such buyers. There is no allegation that Disney is Plaintiff's *only* buyer and, therefore, Disney's unwillingness or inability to purchase the beer effectively terminated *all* of Plaintiff's

8

business activities. The Court cannot infer from the mere assertion that Plaintiff's product spoiled that Plaintiff's operations were suspended. The Complaint therefore fails to allege enough factual matter to plead coverage for lost business income and extra expenses is warranted. *See Iqbal*, 556 U.S. at 678.

Next, the Accounts Receivable Endorsement provides coverage as follows:

> 1. all amounts your customers owe you that you cannot collect;
>
> 2. interest charges on loans you secure to offset impaired receipts until we pay these amounts;
>
> 3. collection costs in excess of normal; and
>
> 4. other expenses you reasonably incur to re-establish your records;
>
> which result from direct physical loss of or damage *to your records of accounts receivable*;
>
> 1. caused by or resulting from any Covered Cause of Loss; and
>
> 2. which occurs on the premises described in the Declarations.

(Doc. 3-1, p. 23) (emphasis added). Defendant argues that the Accounts Receivable Endorsement "is designed to protect against damage to the accounting records themselves, rather than to the products underlying those records." (Doc. 3, p. 19). Defendant supports this argument by pointing to the language "which result from direct physical loss of or damage to your records of accounts receivable." (*Id.*). In response, Plaintiff asserts that "the policy language is ambiguous as to the phrase 'direct physical loss of or damage to Covered Property.'" (Doc. 19, p. 15).

9

Plaintiff's counterargument is erroneous for two reasons. First, Plaintiff points to the general Policy language rather than the specific Accounts Receivable Endorsement language. To establish coverage under the Building and Personal Property Coverage Form, Plaintiff must indeed suffer a "direct physical loss of or damage to *Covered Property*," (*i.e.*, Plaintiff's beer). (Doc. 3-1, p. 33) (emphasis added). But to establish coverage under the Accounts Receivable Endorsement, Plaintiff must suffer "direct physical loss of or damage to [] *records of accounts receivable*," (*i.e.*, Plaintiff's records). (*Id.* at p. 23) (emphasis added). In sum, each Policy provision has an independent trigger for coverage. Although Plaintiff alleged that its beer spoiled, it did not allege any damage to its records of accounts receivable. (*See* Doc. 1-2). Second, the potential ambiguity of the phrase "direct physical loss or damage" is irrelevant because Plaintiff did not allege *any* loss or damage to its records of accounts receivable. The Complaint thus fails to include enough factual matter to plead a plausible claim that coverage for loss of accounts receivable is warranted. *See Iqbal*, 556 U.S. at 678.

In sum, Plaintiff alleges enough facts to support a claim that the loss of its beer was "direct physical loss or damage." However, Plaintiff fails to plead enough facts to support a claim that it is entitled to reimbursement under the terms of the Business Income and Extra Expense Endorsement or the Accounts Receivable Endorsement.

### B. Covered Causes of Loss and Relevant Exclusions

Although Plaintiff sufficiently alleges "direct physical loss of or damage to" its beer, it nonetheless fails to satisfy the pleading standard if it does not allege that the loss was caused by a Covered Cause of Loss.

The Policy's "Covered Causes of Loss" section refers to the Causes of Loss Form, which provides that "Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS" unless an exclusion or limitation applies. (Doc. 3-1, p. 11). Because almost any event can pose a "risk" of loss, the Policy's exclusions and limitations are invaluable in determining what constitutes a Covered Cause of Loss.

The Policy includes two exclusions that are relevant here. First, the Policy does not cover losses or damages caused by "[d]elay, loss of use or loss of market." (*Id.* at p. 12). Second, the "[a]cts or decisions . . . of any person, group, organization or governmental body" is not a Covered Cause of Loss. (*Id.* at p. 13).

The Complaint states:

> As a result of this pandemic, Harvest Moon Distributors LLC's property sustained direct physical loss or damages . . . Plaintiff's *loss of use* of the insured property and insured property's inability to function as contemplated and intended by Plaintiff and Defendant is a direct physical loss. . . . *Due to Walt Disney Parks & Resorts US Inc.'s voluntary closure*, in an effort to minimize risk and help "stop the spread" of the COVID-19 pandemic, Harvest Mood [sic] Distributors LLC lost Business Income, Extra Expense, Inventory, and Accounts Receivable, and sustained other consequential damages and losses. On or about March 19, 2020, Plaintiff submitted its claim to Defendant for Loss . . . due to the COVID-19 pandemic . . . .

(Doc. 1-2, ¶¶ 13, 15, 39–42) (emphasis added). Defendant asserts that the cause of Plaintiff's alleged losses was its inability to sell its beer—that is, Disney's inability or unwillingness to buy Plaintiff's beer—which is not a Covered Cause of Loss under the Policy. (Doc. 3, pp. 14–17, 20–23). By contrast, Plaintiff argues that the pandemic caused its losses. (Doc. 19, pp. 5, 8–11). Plaintiff states that because the Policy does not

11

expressly exclude pandemic events from coverage, the COVID-19 pandemic is a Covered Cause of Loss. (*Id.*).

Although the Policy does not explicitly exclude pandemic-related losses, Plaintiff's loss arose from *Disney's act* of refusing the beer, not from the pandemic. COVID-19 itself did not damage Plaintiff's beer. In other words, Plaintiff's beer would not have been damaged or destroyed but for *Disney's decision*, making Disney the cause of the alleged spoliation. For example, if Disney had accepted and refrigerated Plaintiff's beer or otherwise compensated Plaintiff, then Plaintiff would not have suffered any harm, regardless of the existence of the pandemic.

Rather, COVID-19 merely motivated Disney's decision to voluntarily close and to refuse acceptance of Plaintiff's beer. But Disney's motivation for its decisions is irrelevant. The Policy explicitly excludes from coverage such business decisions by persons, groups, or organizations. The pandemic does not change the terms of the Policy, which the parties bargained for and agreed to. Moreover, the Complaint itself states that Plaintiff experienced "*loss of use*" of its product, which the Policy expressly excludes from coverage. (Doc. 1-2, ¶ 15). Even construing the coverage terms as broadly as possible and the exclusionary terms as narrowly as possible, the Complaint fails to overcome the Policy's exclusionary language. *See Fabricant*, 474 F. Supp. 2d at 1331. Thus, Plaintiff fails to allege enough facts to warrant coverage because Disney's refusal of Plaintiff's product is not a Covered Cause of Loss under the Policy. *See Iqbal*, 556 U.S. at 678.[3]

---

[3] Plaintiff also requests declaratory judgment. (Docs. 1-2, ¶ 31; 3, p. 2). The Eleventh Circuit has held that Florida's Declaratory Judgment Act "is a procedural mechanism that confers subject matter jurisdiction on Florida's circuit and county courts; it does not confer any substantive rights." *Coccaro v. Geico Gen. Ins.*, 648 F. App'x 876, 880 (11th Cir. 2016) (citing *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1138 n.3 (11th Cir.

12

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) (Doc. 3) is **GRANTED**;

2. Plaintiff's Complaint (Doc. 1-2) is **DISMISSED WITHOUT PREJUDICE**; and

3. On or before October 23, 2020, Plaintiff may file an Amended Complaint consistent with the directives of this Order, if it believes it can do so in accordance with Rule 11; and

4. Failure to timely file an Amended Complaint in accordance with the requirements of this Order will result in closure of this action without further notice.[4]

---

2005); *Garden Aire Vill. S. Condo. Ass'n Inc. v. QBE Ins.*, 774 F. Supp. 2d 1224, 1227 (S.D. Fla. 2011); *Nirvana Condo. Ass'n, Inc. v. QBE Ins.*, 589 F. Supp. 2d 1336, 1343 n.1 (S.D. Fla. 2008)). Thus, the federal Declaratory Judgment Act applies, which states in pertinent part: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). However, the basis of Plaintiff's declaratory judgment claim is Plaintiff's assertion that judicial interpretation of the Policy could result in coverage for the loss underlying its breach of contract claim. An actual controversy must exist before the Court can afford declaratory relief and, because the breach of contract claim is dismissed, there is no controversy. *See Mauricio Martinez*, 2020 WL 5240218, at *3 (citing *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227 (1937)). Furthermore, the Supreme Court has held that "[t]he Declaratory Judgment Act was an authorization, not a command. It gave federal courts competence to make a declaration of rights; it did not impose a duty to do so." *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962). Accordingly, Plaintiff's claim for declaratory judgment is dismissed as well.

[4] In the alternative, on or before October 16, 2020, Plaintiff may request the Court to enter judgment dismissing the Complaint with prejudice based on the rulings in this Order to perfect the issue for appeal. Failure to timely file a request to enter judgment dismissing the Complaint with prejudice in accordance with the requirements of this Order will result in closure of this action without further notice.

**DONE AND ORDERED** in Orlando, Florida on October 9, 2020.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

14