# EXHIBIT 5

Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

FOUNDER INSTITUTE INCORPORATED, a )
California Corporation,            )
                                  )
          Plaintiff,              )
                                  )
  VS.                             )  NO. C 20-04466 VC
                                  )
HARTFORD FIRE INSURANCE COMPANY, a )
corporation doing business in     )
California; SENTINEL INSURANCE    )
COMPANY, LIMITED, a corporation   )
doing business in California; and )
DOES 1 through 50, inclusive,     )
                                  )
          Defendants.            )
_____  )

                    San Francisco, California
                    Thursday, October 15, 2020

       TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING OF

             REMOTE ZOOM WEBINAR PROCEEDINGS

             10:58 A.M. - 11:36 A.M. = 38 MINUTES


APPEARANCES VIA ZOOM WEBINAR:

For Plaintiff:
                    SANJIV N. SINGH, APLC
                    1650 South Amphlett Boulevard, Suite 220
                    San Mateo, California 94402
          BY:  SANJIV N. SINGH
               ATTORNEY AT LAW

          (APPEARANCES CONTINUED ON FOLLOWING PAGE)


Transcribed By:  Ana M. Dub, RMR, RDR, CRR, CCRR, CRG, CCG
                 CSR No. 7445

2

1    **APPEARANCES VIA ZOOM WEBINAR:**   (CONTINUED)

2    For Plaintiff:

3                        INDRAJANA LAW GROUP, APLC
                         1650 South Amphlett Boulevard, Suite 220
                         San Mateo, California 94402
4              BY:   **MICHAEL B. INDRAJANA**
                     **ATTORNEY AT LAW**
5

6    For Defendants:

7                        STEPTOE & JOHNSON LLP
                         One Market Plaza
                         Spear Tower, Suite 3900
8                        San Francisco, California 94105
               BY:   **ANTHONY J. ANSCOMBE**
9                    **ATTORNEY AT LAW**

10                       STEPTOE & JOHNSON LLP
                         633 West Fifth Street, Suite 1900
11                       Washington, D.C. 20036
               BY:   **SARAH D. GORDON**
12                   **ATTORNEY AT LAW**

13

14

15

16

17

18

19

20

21

22

23

24

25

**Thursday - October 15, 2020**                                  **10:58 a.m.**

**P R O C E E D I N G S**

---o0o---

  **THE COURT:**  All right.  So this is Case Number

20-4466, Founder Institute Incorporated versus Hartford Fire

Insurance Company, et al.  It's a motion to dismiss.

  Counsel for the plaintiff, you want to state your

appearances?

  Mr. Singh, I think you're muted.

  **MR. SINGH:**  Better?

  **THE COURT:**  Better.

  **MR. SINGH:**  Can you hear me?

  **THE COURT:**  Yes.

  **MR. SINGH:**  My apologies.

  Sanjiv Singh appearing on behalf of plaintiff,

Founder Institute, and with me is my colleague Michael

Indrajana as well.

  **THE COURT:**  Hello.

  **MR. INDRAJANA:**  Hello.

  **MR. SINGH:**  Hello.

  **MR. INDRAJANA:**  Good morning, Your Honor.

  **THE COURT:**  Hi.

  For the defendants?

  **MR. ANSCOMBE:**  Good morning, Your Honor.

  Good morning, Your Honor.  Anthony Anscombe of Steptoe &

```
 1   Johnson for the defendants.

 2          THE COURT:  Good morning.

 3          MS. GORDON:  Good morning, Your Honor.  Sarah Gordon,

 4   also of Steptoe & Johnson, on behalf of Sentinel and Hartford

 5   Fire, the defendants.

 6          THE COURT:  Good morning.  So you all are representing

 7   both defendants?

 8          MS. GORDON:  Yes, Your Honor.

 9          THE COURT:  Okay.  Let me start, I guess, with -- I'll

10   start with you, Mr. Singh.  And I think my first question is

11   just a curiosity.  I don't think it's directly relevant to this

12   motion to dismiss.  It's more of a general question about the

13   lawsuit.

14      But I guess the question is:  What is your -- what is your

15   theory of loss?  Like, what -- like, how much money did --

16   did -- did the company lose?

17          MR. SINGH:  Well, without -- and out of respect for my

18   client, I think I won't speculate on the exact dollar amount,

19   and I say that for a very practical reason.  As you can

20   imagine, from the moment we filed the lawsuit, our focus has

21   been on the obvious and predicted motion practice we would

22   have.

23      I would estimate it is significant.  Probably -- and this

24   is -- I want to emphasize, this is just my preliminary

25   estimate.
```

1        **THE COURT:**  Yeah.  You're not going to be held to

2   anything.

3        **MR. SINGH:**  It's probably a few hundred thousand

4   dollars, given the scope of their activities, the degree to

5   which they were shut down and impeded in those activities; but

6   beyond that, I wouldn't -- I'd be speculating at this point.

7        **THE COURT:**  And does it cover a particular period of

8   time, or is it ongoing?

9        **MR. SINGH:**  And, again, because we have not gotten

10  into the nitty-gritty of discovery, I would say, to my

11  knowledge, there's actually at least two periods, because there

12  was a period -- there were obviously different phases of how

13  the shutdowns were rolled out.  So at least two periods; there

14  may be more than that.

15       **THE COURT:**  And what are the periods?

16       **MR. SINGH:**  The periods would be from the time of the

17  initial pandemic order that obviously came down both from -- at

18  the state and county level, and then there were orders that

19  were further restrictive.  And I don't have the precise dates,

20  but they would have followed in the few weeks after that.

21  Those are the first two initial periods, at least, for which

22  they claimed losses.

23      What I have not had a chance to speak with my client about

24  is whether or not they also have had additional losses

25  following that, during the period, obviously, as the both

1  county orders and the state orders were changing.

2       **THE COURT:**  And so let's say that you were able to get

3  past a motion to dismiss on this particle surface --

4  particles-on-the-surface theory of yours.  How would you

5  establish that the losses were caused by the presence of

6  particles on the surface -- surfaces of the building?

7       **MR. SINGH:**  So let's -- with your indulgence,

8  Your Honor, can I step back?  Because I think there's a

9  predicate question to that before I answer your question, which

10  is, I just want to clarify what our theory is.

11       And we pled it in the alternative quite specifically

12  because we believe expert testimony is going to be key.  And

13  I think we're going to have to have expert testimony, both,

14  likely, from an infectious disease expert and also probably

15  looking -- and there are experts who subspecialize in this in

16  terms of actual -- the behavior of the particles, the behavior

17  of the respiratory droplets, the saliva droplets.

18       But to answer your question, in order to establish the

19  causation behind the loss, I think we would call on expert

20  testimony.  Also, we'd have to look at the actual physical

21  attributes of the surrounding area, see exactly how the

22  specific theories of transmission and, also, risk of

23  transmission would translate to those specific areas.

24       And I say that because I anticipate --

25       **THE COURT:**  I think I probably didn't ask my question

1  clearly enough because -- I'm asking a question at a -- even at

2  a higher level of generality --

3          **MR. SINGH:**  Okay.

4          **THE COURT:**  -- about this lawsuit.

5          **MR. SINGH:**  Forgive me.  You may be --

6          **THE COURT:**  No.  I didn't -- I didn't make it clear.

7      But -- and like I said, it's not -- you were sort of

8  getting into whether there's coverage --

9          **MR. SINGH:**  Sure.

10         **THE COURT:**  -- you know, under the -- under the

11  provision that says, you know, "We'll pay for direct physical

12  loss or physical damage to the covered property."

13     I'm asking something even more general than that, which

14  is:  How are you going to show that any of the losses were

15  attributable to people not being able to come into the

16  building?

17         **MR. SINGH:**  Oh.  Yeah.  And I'm glad you asked that.

18  We actually specifically -- and I'll give you a little insight

19  without getting into privileged information.

20     As we assess these cases, we didn't just --

21         **THE COURT:**  I mean, this is not like a -- this is not

22  a salon.

23         **MR. SINGH:**  Sure.

24         **THE COURT:**  People need to come into the building to

25  use the company's services.  Right?  This is -- so I'm not --

1    I'm not understanding how your losses are attributable to

2    people not coming in -- not being able to come into the

3    building.

4         MR. SINGH:  Because the Founder Institute depended on

5    people -- they actually coordinated their operations from their

6    building.  It was not an operation that easily morphs out of

7    their building into a Zoom environment.

8         Now, granted, one of the things I'm sure which we'll see

9    over time is probably they were able to manage those losses by

10   morphing, as many businesses did.  But there was an initial

11   significant period of loss where planned events, people coming

12   into their building to manage those planned events were

13   completely disrupted and had to be shut down.

14        So I think that --

15        THE COURT:  So, all right.  So let me ask you a

16   hypothetical question.

17        MR. SINGH:  Sure.

18        THE COURT:  The shutdown order in Santa Clara County,

19   the shelter-in-place --

20        MR. SINGH:  Sure.

21        THE COURT:  -- order in Santa Clara County.

22        MR. SINGH:  Sure.

23        THE COURT:  Everybody has to stay home.  You can't go

24   anywhere.  You can't go to businesses.  You can't go to

25   restaurants.  You can't -- there's only one place that

1  you're -- people are still allowed to go and that's

2  Founder Institute, the offices of Founder Institute.   People

3  are still allowed to go there.

4             **MR. SINGH:**  H'm.

5             **THE COURT:**  But they're not allowed to go -- because

6  we're confident that everything is going to be okay if people

7  go there.   Or maybe Founder Institute is just so important that

8  we're not going to prevent people from going there.   But

9  everywhere else -- the restaurants, office buildings,

10  et cetera -- you can't go.

11      Are you saying, then, that your -- the company wouldn't

12  have experienced any losses?

13             **MR. SINGH:**  No, I'm not saying that.   I'm saying

14  that --

15             **THE COURT:**  So then how are the losses attributable to

16  this theory of particles being on the surfaces of the building?

17             **MR. SINGH:**  I'm saying that the first impediment was

18  the orders were put in place, and the orders were put in place

19  to address the issue of the risk of transmission.   One of the

20  risks of transmission was from the concern that there were

21  droplets on surfaces and some of those droplets were

22  potentially infectious.

23      And from that, as a result of those ordinances, both at

24  the state level and the county level, individuals were

25  restricted in how they could travel and where they could

1    travel.  And that immediately impacted Founder's ability to run

2    the events from which it derived revenue, from its office.

3    That's the core theory of loss.

4        And to show it -- and I'm not -- I don't -- I think you're

5    right in pointing out that --

6        **THE COURT:**  So people's freedom -- so on my

7    hypothetical, what you're saying is people were prevented from

8    going other places but they weren't prevented from going to

9    Founders.

10       **MR. SINGH:**  No, I wasn't saying --

11       **THE COURT:**  But, nonetheless, there is still --

12       **MR. SINGH:**  It's both.

13       **THE COURT:**  Okay.  I don't understand.

14       **MR. SINGH:**  They were -- they were prevented --

15       **THE COURT:**  You're saying that you would -- you're

16   saying that you would have suffered losses on my hypothetical

17   where people were still allowed to go to your building?

18       **MR. SINGH:**  Well, they -- but they weren't allowed to

19   go to the building because Founder's --

20       **THE COURT:**  I'm asking you a hypothetical question to

21   try to understand your theory of loss.  Right?  And --

22       **MR. SINGH:**  If they were allowed?

23       **THE COURT:**  You seem to be saying:  The reason that we

24   suffered loss under this policy -- right? -- is because of the

25   risk that people were going to be -- we were shut down.  Right?

1          **MR. SINGH:**  Right.

2          **THE COURT:**  The reason we were shut down was because

3    of the risk that there were droplets on the surface.

4          **MR. SINGH:**  Correct.

5          **THE COURT:**  That's your theory of this case.  We can

6    talk about whether that theory is plausible, but -- but -- but

7    that's your theory of the case.  Right?

8       So now I'm saying -- and you're saying:  We lost money

9    because people couldn't come into our building.

10         **MR. SINGH:**  Correct.

11         **THE COURT:**  And what I'm asking you is:  What if

12   people were allowed to come into your building?  They

13   weren't -- you know, there was a shelter in place, but there

14   was an exception for your building; so people were totally

15   welcome to come into your building.  Would you have suffered

16   any losses as a result of the pandemic under those

17   circumstances?

18         **MR. SINGH:**  I think the answer to that would be yes.

19      Are you -- and to clarify your hypothetical, are you

20   saying:  What if Founder was some kind of essential business?

21         **THE COURT:**  Yes.

22         **MR. SINGH:**  Okay.  So I think in that case, if Founder

23   was some kind of essential business, there would be an

24   argument that the -- there would still be loss, because we

25   actually have clients who were essential businesses who still

1   suffered loss because there was still limitations around their

2   business which prevented the normal number of people from

3   coming to the building.

4        But to answer your hypothetical, I would -- I'd have to

5   say, based on that, and also looking at our other clients who

6   were essential businesses, the answer would be yes.  Obviously,

7   I think it would be a different magnitude of loss.

8        THE COURT:  But I guess my point is, isn't the real --

9   a company like you, as opposed to a beauty salon -- right?  But

10  a company like you, the main loss that you suffered was not

11  because of people's inability to come into the building.  It

12  was because the economy shut down.  Right?

13        MR. SINGH:  I think that is not correct with

14  Founder Institute because of the nature -- and I -- you know,

15  we -- again, without getting into privileged information, we

16  interviewed each of our potential clients about what their

17  actual operations were to make sure that they were not focused

18  on just the impact of the pandemic and economy because,

19  frankly, we didn't want to take a case like that.

20        THE COURT:  So clients were like, "Oh, we can't" --

21  "We need to be able to come into your building to move

22  forward"?

23        MR. SINGH:  Well, the -- in all case- -- without, you

24  know, obviously talking about what they told us specifically,

25  what the theory of damages for Founder is, that they were

1   unable to run their business at their site as a result of the

2   ordinance.  And activities on the site, the actual building of

3   Founder is where they coordinated their revenue-generating

4   events.

5        Now, they --

6        **THE COURT:**  But as a matter of common sense, I mean,

7   revenue-generating events would have dramatically slowed down,

8   if not stopped, in any event.

9        **MR. SINGH:**  Interestingly -- and I would -- I would

10  say that that is an assumption.  I can see why you would think

11  that; but, in fact, I don't think that's correct.

12       And, in fact, if you look in the -- and this will come up

13  if we're allowed to proceed to discovery and to being before a

14  trier of fact on this.  You'll see in the -- in the month

15  following the pandemic, there was significant economic activity

16  in certain sectors.  And I would say one of those sectors was

17  in the area of consultancies, you know, start-up incubators,

18  venture capital.

19       Even, frankly, I mean, look at in the practice of law, how

20  disparate the impact has been depending on the kind of practice

21  you have.  I've had more activity in a number of cases

22  non-COVID related than I've ever had in the last three months,

23  and it's odd.

24       But -- so I think it's an assumption.  I could see why you

25  would question that.

1    My response is, in the case of Founder, no, they otherwise

2    would not have inevitably been impacted that way.

3         **THE COURT:**  Okay.  That seems like a pretty fanciful

4    theory, but I'm not really sure it's relevant to the motion to

5    dismiss.  I was just curious about it.

6         I also -- what also seems fanciful to me is, you know,

7    your theory that, you know, that -- your attempt to connect the

8    shelter in place to a direct physical loss, you know, connect

9    the shelter in place to the idea that you had particles on the

10   surface of your building.

11        But I'm not really sure that that matters because,

12   regardless, I don't understand why the virus exclusion doesn't

13   apply here.

14        And, you know, I read -- there was a case out of Florida,

15   out of the -- a Florida district judge denied a motion to

16   dismiss.  I read that case.  I didn't understand it.  I didn't

17   understand the judge's explanation for why there was some --

18   could be some possibility that the exclusion wouldn't apply.

19        So, and it seems obvious to me that the -- you know, for

20   the reasons that Judge Corley stated in her opinion, that the

21   virus exclusion applies.  And so I wanted to just give you one

22   more chance to explain to me -- either explain to me why it

23   doesn't or explain to me what the -- what the district court in

24   Florida meant.

25        **MR. SINGH:**  Sure.

1       **THE COURT:**  If you could just take one more crack at

2  that, that would be great.

3       **MR. SINGH:**  Sure.  Absolutely.

4     So, first, let me start by -- let's focus on the Florida

5  case first, just to specifically answer your question there,

6  and then I'm going to come back and answer it more broadly.

7     I believe the case you're referring to is *Urogynecology*

8  *Specialists of Florida v. Sentinel Insurance*.

9       **THE COURT:**  Right.

10       **MR. SINGH:**  Is that correct?

11     Obviously, same policy, same carrier, same alleged losses,

12  though, obviously noting your comments on Founder's particular

13  losses.

14     In that opinion, the Court specifically says that she

15  questions -- and I think appropriately -- whether you can

16  conclude at a pleading stage that the language in the virus

17  exclusion was intended to cover a pandemic.

18     And it's interesting.  We went and looked at the

19  opposition papers in the case and downloaded them to see

20  whether it was an argument that the opposing party had made

21  themself or whether the Court sua sponte had observed it,

22  because I think there's something to be said if the Court

23  sua sponte came up with this argument rather than just adopting

24  it.

25     It appears to us, on having read it, that this was a

1   sua sponte observation.  And what she seems to be saying, which

2   hasn't been argued elsewhere but is, I think, very much on

3   point, that if you look at the language in the

4   Sentinel/Hartford policy, the language focuses on other

5   substances that, when you look at it on face value, appear more

6   like pollutants and the language does not seem to anticipate

7   pandemic.

8        Now, there's an interesting sidenote to that.

9        **THE COURT:**  But hold on a second.

10        **MR. SINGH:**  Oh.

11        **THE COURT:**  Hold on a second.

12        Your theory, your theory, your own theory of the case is

13   that the losses resulted from the presence of the virus or the

14   risk of the presence of the virus on your building.  So even

15   though that theory of the case seems fanciful to me, it is your

16   theory of the case.

17        So given that it is -- your allegations are that your

18   losses resulted from the presence of the virus on surfaces in

19   your building, why doesn't it precisely fall within the --

20   within the exclusion?

21        **MR. SINGH:**  Because as we pled, it's actually not the

22   viruses that were the focus of the ordinance.

23        And you keep using the word "fanciful," and I understand

24   that perspective and I appreciate, Your Honor, your view of it

25   is that it is a reach.

1        And maybe this is just perspective.  I have a very

2   different view of it.  I mean, and it's actually --

3            **THE COURT:**  Okay.  But wait a minute.  Hold on.

4            **MR. SINGH:**  Yeah.

5            **THE COURT:**  Your -- you started to ans- -- you started

6   to answer my question, and then you -- you --

7            **MR. SINGH:**  Yeah.  So let me, first, answer your

8   question.

9            **THE COURT:**  You said -- you said that -- my question

10  to you was:  Your theory of the case is that your losses are

11  attributable to the virus actually being on surfaces in the

12  building.

13       And you started to say:  No, that's not really our theory

14  of the case?

15           **MR. SINGH:**  No.

16           **THE COURT:**  So --

17           **MR. SINGH:**  No.

18           **THE COURT:**  So what is --

19           **MR. SINGH:**  Yeah.

20           **THE COURT:**  -- your theory of the case?

21           **MR. SINGH:**  Well, because if you -- in our pleadings,

22  we tried to be very specific because we actually think this

23  should be the subject of the expert testimony, which is that,

24  really, what the concern was initially with the ordinances and

25  with the actual surface damage is the presence of human

1    droplets.  And I think that has been crystallized even --

2        THE COURT:  The presence -- the concern -- that's -- I

3    mean, that is -- that is really something.  The concern with

4    the ordinance was not with the virus but with the presence of

5    human droplets?

6        MR. SINGH:  Well, droplets being the medium by which

7    the viruses are transmitted.  And it's not even that they

8    thought --

9        THE COURT:  That's just you say tomato, I say tomahto.

10       In the -- your whole point is, the virus was in droplets

11   on our building; and, therefore, we -- people couldn't come

12   into our building where the virus might have been in droplets

13   on our building.  And, therefore, people couldn't come into our

14   building; and, therefore, we experienced loss.

15       You have pled a theory of contamination that you are now

16   contending that the judge in Florida sort of concluded didn't

17   apply to the pandemic.

18       MR. SINGH:  Well, I think she -- she made it a

19   point -- which I agree with, and, obviously, respectfully, you

20   don't agree with -- which is that she analogized those other

21   substances more like pollutants.  And then she made the point:

22   What we're dealing with here is unprecedented because --

23       THE COURT:  But what you're calling -- you, in your

24   complaint, are analogizing this to a pollutant.

25       MR. SINGH:  Well, we're saying that there was damage

1    from droplets.  I wouldn't say we are analogizing it per se to

2    a pollutant.  Certainly, pollutants are comparable.

3            THE COURT:  No.  You're actually calling it a

4    pollutant.  You're saying there was damage from droplets on the

5    building.

6            MR. SINGH:  Sure.  But not a pollutant in the way that

7    was anticipated by the language here.  This is -- this was

8    unprecedented.  This was a time that, at least in my lifetime,

9    none of us have ever confronted, where there was a concern --

10   and even right now the data is conflicting on how many of those

11   droplets actually contained the virus and how many didn't.

12   That's actually a big debate.  Why has the CDC changed its

13   position on surface transmission as many times as it has?

14           THE COURT:  Why is that relevant to this case?  I just

15   don't understand why that's relevant to your claim for

16   coverage.

17           MR. SINGH:  Because it goes to the issue of whether or

18   not the virus exclusion should apply or whether what was really

19   at issue here is the presence of the human droplets.  And that,

20   to me, should be put before a trier of fact.

21           THE COURT:  The presence of the human drop- -- on your

22   theory, the presence of the human droplets that may contain the

23   virus.

24           MR. SINGH:  Right.  But here, let me try it this way

25   as a hypothetical:  Would your view change -- and there are

two -- at least two possible scenarios.  One is one which is

virus is everywhere.  Right?  And you'll see this echoed in

Judge Chesney's language.  She raises a question at the end in

the transcript.  She says:  Look, virus is everywhere.  But the

assumption she's making when she makes that statement is that

the vast majority of respiratory droplets that were on these

surfaces contained the virus particle.  But, in fact, there's

data to suggest that's not the case.

     And our argument is that that --

          **THE COURT:**  Of course it's not the case.

          **MR. SINGH:**  Say it again.

          **THE COURT:**  I said of course it's not.

          **MR. SINGH:**  Oh, sorry.  I didn't hear you.

     Right.  Well, at least -- I'm not sure everyone agrees

with that, but I agree with you, that is not the case.

     And so as such, that's where we -- that's why we have the

perspective that the droplets are the issue at the core in

terms of what the damage is, not the virus itself.  That's what

the ordinances were really --

          **THE COURT:**  You know, this sort of reminds me of a

patent case where, you know, the patent plaintiff comes in and

they're waving around this patent which describes a hammer; and

they say that the defendant, who is using a screwdriver, is

violating the patent that covers the hammer.

     I mean, you're just playing word games.  Really, I mean, I

1   just -- you're saying that it's because of the pandemic and

2   you're saying that it's because of the virus, but you're

3   saying, no, it's not actually because of the virus; it's

4   because of droplets that might have the virus.

5       I mean, you're just play- -- it's just a word game to try

6   to wriggle out of the exclusion.  But the distinction you're

7   drawing is meaningless.  I just -- I really don't -- I really

8   don't understand your theory.

9       I mean, let me ask you this:  Should I give you leave to

10  amend?  I mean, and if I -- if I gave you leave to amend and if

11  I said that there is -- your attempted distinction between

12  virus on the surface -- droplets on the surface with virus and

13  droplets on the surface that may have virus is not a meaningful

14  distinction -- okay? -- and I rejected that theory of -- that

15  theory -- that attempt to get past the motion to dismiss, would

16  you have anything left to allege?  I mean, is that your best

17  shot?

18          **MR. SINGH:**  I'm hesitating, to not answer you

19  quickly --

20          **THE COURT:**  No.  Take your time.

21          **MR. SINGH:**  -- because it is an important question.

22      When you say "is that my best shot," the implication would

23  be do I have another shot, another what defendants might call

24  artful pleading?  And --

25          **THE COURT:**  That's what I would call it too.

1      **MR. SINGH:**  And I would -- and obviously, you know, I

2      can infer from your comments that you are in the camp that

3      views our complaint as artful pleading.

4          I will say this genuinely.  I disagree with the Court on

5      its view of the distinction between the droplets and the virus

6      as it applies to the exclusion.  I personally think that that

7      should go to a trier of fact and to expert testimony.

8          I think that there is evidence in the public records that

9      show that there were focuses on the droplets themselves, not

10     just the virus, and that, ultimately, it should lead to a

11     concurrent causation analysis as to which ultimately was the

12     cause of the loss.

13         But to answer your question, I would say yes, we should be

14     given leave to amend, not for the purposes of coming up with

15     some clever artifice to get around it, but to try and persuade

16     you otherwise, that that distinction is meaningful.

17         And I will say that --

18         **THE COURT:**  So, I mean -- okay.  I think that this --

19     this word game that you're playing now between "droplets" and

20     "virus" really underscores why there's probably no coverage to

21     begin with.  Right?

22         I mean, you know, we have this discussion about whether

23     it's the virus or the droplets, and all it does is shine a

24     light on the fact that nobody shut you down because of droplets

25     in your building.  Right?  You were shut down, like everybody

1  else was shut down, because of the generalized risk of the

2  spread of virus; and there was nothing about your building in

3  particular that caused the shutdown.

4  And because there was nothing about your building in

5  particular that caused the shutdown, it seems to me that you

6  are not covered for direct physical loss of the covered

7  property.  That's not why you were shut down.  You were shut

8  down because of this generalized risk of people spreading the

9  violence -- virus, by whatever means, to each other wherever

10 they happened to meet.

11 So, you know, I don't think that I need to rule on that

12 because it seems so clear that you're not -- you know, that you

13 fall within the virus exclusion.  But I do think that this

14 whole discussion really sort of shines a light on how weak your

15 coverage theory is to begin with.

16 Do you have a -- do you want to tell me what I might be

17 missing?  Again, I'm not -- my inclination would be to do a

18 short written ruling on this, to rule only on the virus

19 exclusion --

20         **MR. SINGH:**  Mm-hmm.

21         **THE COURT:**  -- and not to rule on whether you -- you

22 know, there cov- -- you know, there would be coverage but for

23 the exclusion.

24         **MR. SINGH:**  Mm-hmm.

25         **THE COURT:**  Because I know a lot of courts are dealing

```
 1   with that and I don't think I need to deal with it here.  Let
 2   them deal with it.
 3        But I'm just curious.  Do you have a response to what I'm
 4   saying?
 5            MR. SINGH:  Yeah, I do.  And part of it is a process
 6   question for you, Your Honor, and the other is a substantive
 7   observation.
 8        So, first, my process question.  You mentioned that you're
 9   considering a short order with your views on the virus
10   exclusion.  And I'm assuming -- are you leaning towards not
11   giving us leave to amend?
12            THE COURT:  I mean, I guess what I will say is this:
13   I am having a very hard time imagining how you could amend your
14   complaint to get out from under the virus exclusion.  But
15   I think probably, in an abundance of caution, since this is the
16   first time I've considered a motion in this case, that I should
17   probably give you leave to amend.
18            MR. SINGH:  Okay.  Well, then --
19            MS. GORDON:  Can I be heard on the amendment,
20   Your Honor, when Mr. Singh is finished?
21            MR. SINGH:  Can I just finish my answer?
22            THE COURT:  Briefly, yeah.
23            MS. GORDON:  Go ahead, Mr. Singh.
24            THE COURT:  Go ahead, Mr. Singh.
25            MR. SINGH:  Oh, sorry.  Yeah.
```

1    And I wasn't meaning to cut you off, Ms. Gordon.  I just

2  wanted to finish my answer.

3          **MS. GORDON:**  I understand.

4          **MR. SINGH:**  So given that, that you're going to give

5  us leave to amend or likely are going to give us leave to

6  amend, the only substantive comment that I would make would be,

7  we'll give it our best shot to persuade you otherwise in that

8  amendment.

9      I do think that having some opinion from the Court also on

10  the question of damage loss could be helpful, simply because it

11  could avoid us, on the smaller chance that we persuade you

12  otherwise --

13          **THE COURT:**  Well, you've just heard my -- you just

14  heard my comment -- right? -- is that, I mean, it seems like

15  this whole thing is a fiction, that this whole lawsuit is based

16  on a fiction that the reason you were shut down is because you

17  had bad particles on the surface.  And that's why -- you know,

18  that's not why you were shut down.

19          **MR. SINGH:**  Well, would you allow us to amend -- in

20  your order, are you going to have the order -- it would be

21  helpful if your order was -- we can amend as we see fit rather

22  than just on the specific issue of virus exclusion, so that at

23  least --

24          **THE COURT:**  You can amend however you want to amend.

25          **MR. SINGH:**  Okay.  That would be helpful.

1      **THE COURT:**  Okay.  Now, Ms. Gordon is going to try to

2  talk me out of that statement that I just made.

3                    (Laughter.)

4      **MS. GORDON:**  Recognizing the liberal leave to amend,

5  I'll still try to talk you out of it, Your Honor.

6      This is already their third shot.  This is their second

7  amended complaint.  That means they've tried three times to

8  make allegations sufficient to establish coverage under the

9  policy and they've failed.

10     And courts in California on COVID-19 claims have been

11  dismissing these claims with prejudice.  The *Mark's Engine*

12  court did it recently.  The *Pappy's* court dismissed and then

13  said, "Amendment would be futile," and denied the motion to

14  amend.

15     And on this very same virus exclusion, we succeeded in

16  Pennsylvania, Eastern District of Pennsylvania, Judge Robreno,

17  who dismissed with prejudice because there was -- an amendment

18  would be futile.

19     I recognize there's liberal leave here, but I -- you know,

20  we've done this in a number of jurisdictions.

21     **THE COURT:**  I understand.

22     **MS. GORDON:**  The amendments don't change --

23     **THE COURT:**  I mean, I have a lot of -- I have a lot of

24  sympathy for what you're saying.  But I think, in an abundance

25  of caution, I'm going to let them take one more whack at the

1  mole.

2        **MS. GORDON:**  Understood, Your Honor.

3        **MR. SINGH:**  I just want to note for -- I just -- can I

4  just correct something for the record, Your Honor?

5        **THE COURT:**  Go ahead.

6        **MR. SINGH:**  Yeah.  The amendments -- the fact that we

7  were at a second amended complaint wasn't related to

8  prior motions --

9        **THE COURT:**  It doesn't matter.  Next time is going to

10  be your last chance.  Okay?

11        **MR. SINGH:**  Fair enough.

12        **THE COURT:**  So I guess the only other question I had

13  right now was about the -- the other defendant.  And I saw

14  Judge Corley dealt with -- dealt with that issue in the -- you

15  know, in the way that you would propose that I deal with it

16  here.

17      And I guess my -- it seems -- I guess what I would say is

18  this.  And this is to the defendants now.  It seems like that

19  defendant, whose acronym I can't remember, needs to be

20  dismissed.  Right?  And it seems like a lot of times -- it

21  seems like it's common for a defendant like that to be

22  dismissed for lack of jurisdiction.  Right?  Lack of standing?

23  And I guess I'm scratching my head a little bit at that.  It

24  seems like -- and I know courts do it all the time, but I'm

25  just questioning whether that's the right way to do it.

1     What you're basically saying is:  Look, they've got the

2  wrong guy.  Right?  And if they've -- if they've -- you know, I

3  didn't do it.  I didn't do any of this.

4     And if the answer is "I didn't do it," then why would

5  the -- why wouldn't you dismiss the lawsuit on the merits?  And

6  if you can establish at the pleading stage "I didn't do it,"

7  then why wouldn't you get the lawsuit dismissed on the merits,

8  on 12(b)(6) grounds, as opposed to for lack of jurisdiction?

9          **MR. ANSCOMBE:**  Your Honor, I can address that.

10     So the reason for doing it this way -- and we have, in

11  fact, moved, both under 12(b)(1) based on lack of subject

12  matter jurisdiction and on 12(b)(6) grounds, that because

13  Hartford Fire Insurance Company is a stranger to the contract,

14  it can't be held --

15          **THE COURT:**  But if I dismiss it for lack of

16  jurisdiction, I shouldn't also dismiss it on the merits.

17  Right?

18          **MR. ANSCOMBE:**  Well, the reason -- well, Your Honor,

19  the reason that we do it that way is that, I think one of the

20  legal truisms that, you know, one reads is that the Court

21  should always be sure of its jurisdiction before reaching

22  merits issues.

23     And since there is a viable standing defense here that a

24  lot of courts have recognized, that's why we led with that.

25  I think, theoretically, that's what should go first.  But we

```
 1   believe, obviously, that under 12(b)(6), that the same
 2   result --
 3              THE COURT:  Well, I'm just --
 4              MR. ANSCOMBE:  -- should occur.
 5              THE COURT:  You know, and whether it makes a practical
 6   difference, I don't know; but I just -- I was -- the analogy I
 7   came up with this morning was, let's say you're -- you know, we
 8   have a case right now about protesters being shot with rubber
 9   bullets by the police.  Right?
10        So let's say you have -- let's say I'm a protestor and I
11   get shot by a crowd of police officers by a rubber bullet.  And
12   I sue Officer X and I say that Officer X, you know, shot me
13   with the rubber bullet and it's excessive force, and I bring a
14   1983 action against Officer X.  And let's say that there are
15   some allegations in the complaint which make clear that I got
16   the wrong guy.  Right?  It wasn't Officer X who shot me with
17   the rubber bullet.
18              MR. ANSCOMBE:  Yeah.
19              THE COURT:  It was Officer Y who shot me with the
20   rubber bullet, and Officer X didn't do anything.  Right?
21        And there's a motion to dismiss brought by Officer X.  I
22   assume that would be a motion -- I mean, I may be thinking
23   about this wrong, but I assume that would be a motion to
24   dismiss under 12(b)(6).  Right?
25        You have not stated a claim against me.  In fact, your
```

1   allegations show that it wasn't me who did it; and therefore,

2   the lawsuit against me should be dismissed.  And it should not

3   be dismissed for lack of jurisdiction.  It should be dismissed

4   on the merits because I didn't do it.

5        And I should have the protection of a merits ruling which

6   says that I didn't do it so that somebody -- you know, because

7   a dismissal for lack of jurisdiction is -- you know, it's not

8   a -- it's not a decision on the merits.  It's not res judicata.

9   And so if I'm Officer X, I don't want a dismissal for lack of

10  jurisdiction because then maybe they'll come try and sue me in

11  state court next time or whatever.

12       And why isn't this analogous?  I mean, why isn't -- why

13  isn't it that, you know, that -- why is it not a standing

14  question?  Because for standing, we presume success on the

15  merits.  We presume you're going to succeed in your allegations

16  when we're assessing standing.  Right?

17       And then so we'd say:  Okay, assuming that the -- so as

18  applied to my officer analogy, we'd say:  Okay, assuming that

19  Officer X did it, there is standing to sue Officer X.  But as

20  of -- on the merits, Officer X didn't do it, and so we dismiss

21  it on the merits.

22       That's the way I think of it.  But I feel like I must be

23  missing something, at least in the context of these contract --

24            **MR. ANSCOMBE:**  Well, I think --

25            **THE COURT:**  -- cases, because it seems like the courts

tend -- regularly dismiss defendants who are not party to the

contract for lack of standing as opposed to on the merits.

      **MR. ANSCOMBE:**  Yeah.  And, again, Your Honor, I --

so -- so I guess a couple of reactions to that.

    In the -- in the rubber bullet circumstance, you know, I

would imagine that there may be some, you know, risk of getting

sued again in state court or, you know, having the case

proceed.

    You know, it is certainly our fervent hope here that if

this claim gets dismissed against HFIC, the plaintiffs will

give up, because there's absolutely no reason for it to be in

here.  The plaintiffs have a viable defendant in Sentinel.  And

the allegations as to HFIC, you know, I mean, why bother?

    So, but I -- but I think to the direct legal question,

Your Honor, I would say that, you know, analytically, you know,

a court should consider its own jurisdiction to enter a merits

ruling first.  That's -- you know, and I think we, as members

of the Bar, have an obligation to -- you know, to bring a lack

of jurisdiction to the Court's attention.  And so that's what

we're doing here.

    Yes, we think we would have a very fine merits -- we think

we do have a very fine merits defense as well.

      **THE COURT:**  Well, it would be --

      **MR. ANSCOMBE:**  You know --

      **THE COURT:**  -- for the -- if for no other reason than

```
 1   the same -- I mean, first, you didn't to it; and, second --
 2           MR. ANSCOMBE:  Right.
 3           THE COURT:  -- even if you did, you didn't do anything
 4   wrong for the reasons that it would be dismissed as to -- as to
 5   Hartford.  Right?
 6           MR. ANSCOMBE:  Right.
 7           THE COURT:  Anyway, I'm going to try not to go down
 8   the rabbit hole on that.
 9                          (Laughter.)
10           THE COURT:  Wouldn't be worth it.
11           MR. ANSCOMBE:  That's good.
12           THE COURT:  Yeah.  Briefly, Mr. Singh.
13           MR. SINGH:  Yeah.  Sorry.  Just briefly, I was just
14   going to say, the distinction, I think, is in our pleadings and
15   also our citation to exhibits that's on page 6 of our
16   opposition.
17       You know, the concern, I think, from past courts has been
18   lumping Hartford together with Sentinel just because the name
19   appears on marketing material.  And I will say that we, both in
20   our pleadings and our exhibits, we think that Hartford actually
21   played a role in the provision of the policy, the assessment of
22   the risk, how the claims were handled and, for that reason,
23   should be named as a defendant.
24       I just wanted to get that onto the record.
25           THE COURT:  Okay.  All right.  Thanks.  I'll issue a
```

1     short ruling shortly.

2              **MR. ANSCOMBE:**  Okay.  Thanks very much.

3              **MS. GORDON:**  Thank you, Your Honor.

4              **MR. SINGH:**  Thank you, Your Honor.

5              **THE COURT:**  Thank you.

6              **MR. ANSCOMBE:**  Appreciate it.

7                   (Proceedings adjourned at 11:36 a.m.)

8                              ---o0o---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    **CERTIFICATE OF TRANSCRIBER**

3

4          I, ANA M. DUB, CSR NO. 7445, RDR, CRR, CCRR, CRG, CCG,

5    certify that the foregoing is a true and correct transcript, to

6    the best of my ability, of the above pages of the official

7    electronic sound recording provided to me by the U.S. District

8    Court, Northern District of California, of the proceedings

9    taken on the date and time previously stated in the above

10   matter.

11          I further certify that I am neither counsel for,

12   related to, nor employed by any of the parties to the action in

13   which this hearing was taken; and, further, that I am not

14   financially nor otherwise interested in the outcome of the

15   action.

16

17   DATE:   Thursday, October 22, 2020

18

19

20

21

22   _____

23        Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG

24

25